IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CINDI ASMAN, | ) | CIVIL NO. 24-00017 HG-RT |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MARTIN O'MALLEY, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER REVERSING THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION COMMISSIONER AND REMANDING THE CASE FOR FURTHER PROCEEDINGS**

This case involves the appeal of the Social Security Administration Commissioner's denial of Supplemental Security Income Benefits to Plaintiff Cindi Asman.

Plaintiff asserts she has been disabled since January 1, 2017. Plaintiff's claimed disability is based on post-traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder.

On June 11, 2020, Plaintiff filed an application for Supplemental Security Income pursuant to Title XVI of the Social Security Act.

On February 10, 2021, the Social Security Administration initially denied her application for Supplemental Security Income.

Following an administrative hearing on January 12, 2023, the Administrative Law Judge ("ALJ") issued a decision denying

1

Plaintiff's application for benefits pursuant to Title XVI of the Social Security Act.  The ALJ found that Plaintiff was not disabled and was not entitled to Supplemental Security Income.

On November 14, 2023, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.

On January 12, 2024, Plaintiff appealed to this Court.

On July 1, 2024, the Court held a hearing on Plaintiff's appeal.

The Court **REVERSES** the decision of the Social Security Administration Commissioner and **REMANDS** the case for further evaluation.

## PROCEDURAL HISTORY

On June 11, 2020, Plaintiff Cindi Asman filed an application for Supplemental Security Income with the Social Security Administration.  (Administrative Record ("AR") at pp. 164-220, ECF No. 8).

On February 10, 2021, the Social Security Administration denied Plaintiff's initial application.  (AR at p. 17).

On May 11, 2021, the Administration denied her request for reconsideration.  (Id.)

Following the denial of Plaintiff's request for reconsideration, she sought a hearing before an Administrative Law Judge ("ALJ").  (Id.)

On January 12, 2023, an ALJ conducted a hearing on

Plaintiff's application.   (AR at pp. 39-55).

On March 1, 2023, the ALJ issued a written decision denying Plaintiff's application for Supplemental Security Income.   (AR at pp. 17-31).

Plaintiff sought review by the Appeals Council for the Social Security Administration.   The Appeals Council denied further review of Plaintiff's application on November 14, 2023, rendering the ALJ's decision as the final administrative decision by the Commissioner of Social Security.   (AR at pp. 1-3).

On January 12, 2024, Plaintiff sought judicial review of the Commissioner of Social Security's final decision to deny her application for Supplemental Security Income in this Court pursuant to 42 U.S.C. § 405(g).   (Complaint for Review of Social Security Supplemental Security Income Determination, ECF No. 1).

On March 14, 2024, the Magistrate Judge issued a briefing schedule.   (ECF No. 9).

On April 8, 2024, Plaintiff filed PLAINTIFF'S OPENING BRIEF. (ECF No. 10).

On May 8, 2024, the Defendant filed DEFENDANT'S ANSWERING BRIEF.   (ECF No. 12).

On May 20, 2024, Plaintiff filed her Reply Brief and an AMENDED REPLY BRIEF.   (ECF Nos. 13 and 14).

On July 1, 2024, the Court held a hearing on Plaintiff's appeal of the decision of the Social Security Administration Commissioner.   (ECF No. 17).

**BACKGROUND**

**Plaintiff's Background and Work History**

Plaintiff is a 56 year-old female.  (Administrative Record ("AR") at p. 29, ECF No. 8).  Plaintiff is a practicing Muslim and wears a hijab and a burka in public that leaves only her hands and face exposed.  (Id. at pp. 332, 437).

Plaintiff reported to her medical providers that she experienced childhood abuse including emotional and sexual abuse.  (Id. at pp. 333, 437, 440).  Plaintiff indicated that she suffers from nightmares and flashbacks as a result of her painful childhood.  (Id.)

Plaintiff reported that she graduated from high school in the late 1980's and performed various types of employment, working in offices and restaurants in her teens.  (Id. at p. 348).

After high school, Plaintiff attended trade school for massage therapy.  (Id.)  Plaintiff worked as a massage therapist in the 1990's but left that job when she married and had children.  (Id.)

Plaintiff lived in California during her marriage. Plaintiff suffered from severe abuse and domestic violence during her marriage.  (Id. at pp. 348, 437).

In 2017, while she was still married and living in California, Plaintiff took seasonal work as a sales associate at Old Navy in order to earn enough money to leave her husband.

4

(Id. at pp. 19, 42-44; see also id. at pp. 421, 437).  Plaintiff testified that she only folded clothes and did not work at the register.  (Id. at pp. 43-44).  Plaintiff suffered from panic attacks during the job and would sometimes need to leave suddenly.  (Id. at pp. 348, 437).  Plaintiff's job ended because it was only seasonal work.  (Id.)

Plaintiff left her husband in 2017 and moved to Hawaii. (Id. at p. 348).  Plaintiff currently lives in Hawaii with two of her children who are in their late teens.  (Id.)

Plaintiff's last reported annual earnings were $13,431 in 2017, $3,854 in 2018, and $391 in 2019.  (Id. at p. 19).

Plaintiff has a long history of diagnoses with major depressive disorder, anxiety disorder, and post-traumatic stress disorder as a result of her childhood abuse and adult domestic violence and abuse.  (Id. at p. 333).

After moving to Hawaii in 2017, Plaintiff began seeing a therapist, Alissa Gino, LMCH, and a psychiatrist, Dr. David Thompson, M.D.  Plaintiff sought medical assistance because she was suffering from anxiety, panic attacks, intrusive thoughts, nightmares, distractability, impaired concentration, and difficulty completing tasks and paying attention due to her history of trauma and abuse.  (Id. at pp. 333, 347-48).

**Plaintiff's Medical History**

**Alissa Gino, LMHC    (Plaintiff's Therapist from May 2017 to December 2022)**

Alissa Gino, Plaintiff's therapist and Licensed Mental Health Counselor ("LMHC"), saw Plaintiff for 40 visits between 2017 and 2020.  (Id. at p. 343).  Ms. Gino diagnosed Plaintiff with post-traumatic stress disorder and agoraphobia as a result of severe childhood abuse and trauma.  (Id. at p. 343).

Ms. Gino's records explain that Plaintiff was a victim of domestic violence and abuse as an adult and recently fled from her husband, her abuser, prior to moving to Hawaii.  (Id.).

Plaintiff reported nightmares, panic attacks, fear of people and crowded places, and disassociation.  (Id.)  Ms. Gino determined that Plaintiff suffered from severe agoraphobia which interferes with her ability to interact with others.  (Id. at p. 345).  Ms. Gino also reported that Plaintiff's symptoms resulted in flashbacks and panic attacks that affected Plaintiff's ability to concentrate.  (Id.)

**Dr. David Thompson, M.D. (Plaintiff's Psychiatrist from January 2018 to June 2018)**

Plaintiff's medical records with her psychiatrist David A. Thompson, M.D., reflect Plaintiff reported a history of childhood emotional, physical, and sexual abuse and a history of domestic violence.  (Id. at pp. 319-338).

Plaintiff was diagnosed with a major depressive disorder,

6

anxiety disorder, and post-traumatic stress disorder.  (Id. at p. 333).  Plaintiff's medical records reflect a history of panic attacks, nightmares and flashbacks, sudden heart palpitation, fear, difficulty breathing, lightheadedness, and anxiety.  (Id. at p. 332).  Plaintiff also reported insomnia and difficulty concentrating.  (Id. at p. 331).

The records reflect Plaintiff missed scheduled appointments with Dr. Thompson.  (Id. at pp. 319, 329).  Plaintiff indicated that she wished to see a female psychiatrist and stopped seeing Dr. Thompson because no female psychiatrist was available.  (Id. at pp. 329, 416, 421).

**Nicole Aurellano, Psy.D. (Four State of Hawaii Psychological Evaluations from March 2019 through March 2021)**

On March 16, 2019, September 21, 2019, October 17, 2020, and March 20, 2021, Nicole Aurellano, Psy.D. from the State of Hawaii Department of Human Services conducted psychiatric evaluations of Plaintiff.  (Id at pp. 308-17, 414-39).

In March 2019, Dr. Aurellano diagnosed Plaintiff with various affective and anxiety disorders with symptoms including difficulty concentrating or thinking, depressed mood, fatigue, and sleep disturbance.  (Id. at p. 316).

On September 21, 2019, Dr. Aurellano found that Plaintiff's post-traumatic stress disorder and depression were worsening and that Plaintiff was suffering from recurrent severe panic attacks.

(Id. at pp. 310-11).  Dr. Aurellano explained that Plaintiff was experiencing agoraphobia and was unable to leave her home, not even to the mailbox, because she was experiencing anxiety, worsening of nightmares, and loss of appetite as her ex-husband was continuing to contact her which made her feel she was in danger of imminent harm.  (Id. at p. 416).

In October 2020, Dr. Aurellano found that Plaintiff continued to suffer from post-traumatic stress, major depressive disorder, agoraphobia, and panic attacks which were exacerbated by psychosocial stressors to include ongoing harassment from her estranged husband.  (Id. at p. 422).

In March 2021, Dr. Aurellano found Plaintiff's depression, post-traumatic stress disorder, and anxiety continued to worsen, that Plaintiff struggled starting and finishing tasks, had difficulty being around others, especially crowded places, and even struggled to go grocery shopping or complete any task that required interaction with others.  (Id. at p. 426).

**Dawn Harada, Psy.D.          (State of Hawaii Psychological**
**                              Evaluation in February 2021)**

On February 8, 2021, Dawn Harada, Psy.D. evaluated Plaintiff on a referral for a psychological evaluation.  (Id. at p. 347). Dr. Harada conducted various assessments of Plaintiff, including the World Health Organization Disability Assessment Schedule, the Patient Health Questionnaire (PHQ-9), and the Generalized Anxiety Disorder Scale (GAD-7).  (Id.)

As a result of her clinical evaluation and diagnostic testing, Dr. Harada diagnosed Plaintiff with post-traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder, severe, without psychotic symptoms.  (Id. at p. 350).

**Dale T. Higashino, Psy.D.        (State of Hawaii Psychological
                                   Evaluation in October 2021)**

In October 2021, Dale T. Higashino, Psy.D. from the State of Hawaii Department of Human Services conducted a psychiatric evaluation of Plaintiff.  (Id. at pp. 431-34).  Dr. Higashino found Plaintiff had a history of trauma including physical, verbal, and sexual abuse in childhood and domestic violence and physical assault as an adult.  (Id. at p. 432).

Similar to Dr. Aurellano, Dr. Higashino diagnosed Plaintiff with several affective and anxiety disorders and found she suffered from symptoms including difficulty concentrating or thinking, depressed mood, sleep disturbance, fatigue, easy distractability, phobias, recurrent severe panic attacks, and recurrent obsessions or compulsions.  (Id. at p. 433).  Dr. Higashino explained that Plaintiff reported that "she does not seem to get anything done during the day due to her anxiety, lack of energy, and poor concentration."  (Id. at p. 432).

**Erin Ogawa, Psy.D.  (State of Hawaii Psychological Evaluation in August 2022)**

On August 17, 2022, Erin Ogawa, Psy.D. from the State of Hawaii Department of Human Services conducted a psychiatric evaluation of Plaintiff.  (Id. at pp. 436-39).  Just as Dr. Aurellano and Dr. Higashino, Dr. Ogawa diagnosed Plaintiff with several affective and anxiety disorders and found she suffered from symptoms including difficulty concentrating or thinking, depressed mood, sleep disturbance, fatigue, easy distractability, phobias, recurrent severe panic attacks, and recurrent obsessions or compulsions.  (Id. at p. 438).

Dr. Ogawa explained that Plaintiff had poor concentration, fatigue, panic attacks, and a history of fainting, shaking, difficulty leaving her room even to take a shower, and suffered from flashbacks based on her history of trauma.  (Id. at p. 437).

**The Social Security Administration's Review of Plaintiff's June 11, 2020 Application For Supplemental Security Income Benefits**

Plaintiff's June 11, 2020 application for Social Security Administration Supplemental Security Income was initially denied on February 10, 2021.  (AR at p. 17, ECF No. 8).

Following the initial denial, Plaintiff moved for reconsideration.  On May 11, 2021, the Social Security Administration denied Plaintiff's motion for reconsideration. (Id.).  On May 29, 2021, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id.)

10

On January 12, 2023, a telephonic hearing on Plaintiff's application for Social Security Administration Supplemental Security Income was held before an ALJ.  (Id. at pp. 39-55).

Following the hearing, on January 20, 2023, the ALJ issued interrogatories to the vocational expert Brenda Cartwright, Ed.D., that included questions drafted by the ALJ and questions drafted by Plaintiff's counsel.  (Id. at pp. 267-78).  Plaintiff's counsel explained that she was unable to view the ALJ's interrogatories before submitting her own interrogatories.

On January 23, 2023, the vocational expert responded to the ALJ's interrogatories and Plaintiff's counsel's interrogatories.  (Id. at pp. 282-92).

On March 1, 2023, the ALJ denied Plaintiff's application for Supplemental Security Income.  (Id. at pp. 17-31).

Plaintiff asserted that she was disabled for a continuous period following January 1, 2017.  Plaintiff claimed that she was disabled for a period of not less than twelve months due to her post-traumatic stress disorder, agoraphobia, depression, anxiety, panic attacks, and fatigue.  (Id. at pp. 19-21).

The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925 and 416.926.  (AR at p. 20, ECF No. 8).

The ALJ found that considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs

11

that exist in significant numbers in the national economy that Plaintiff can perform.  (<u>Id.</u> at p. 29).

Plaintiff sought review of the Administrative Law Judge's decision with the Appeals Council.  The Appeals Council declined Plaintiff's request for review and rendered the ALJ's decision as the final administrative decision by the Commissioner of Social Security.  (<u>Id.</u> at pp. 1-3).

<u>**STANDARD OF REVIEW**</u>

A claimant is disabled under the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); <u>see</u> 42 U.S.C. § 1382c(a)(3)(A); <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).

A decision by the Commissioner of Social Security must be affirmed by the District Court if it is based on proper legal standards and the findings are supported by substantial evidence on the record as a whole.  <u>See</u> 42 U.S.C. § 405(g); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>see also</u> <u>Tylitzki v. Shalala</u>, 999 F.2d 1411, 1413 (9th Cir. 1993).

**ANALYSIS**

## I.   Applicable Law

The Social Security Administration has implemented regulations establishing when a person is disabled so as to be entitled to Supplemental Security Income benefits under the Social Security Act, 42 U.S.C. § 1382c.  The regulations establish a five-step sequential evaluation process to determine if a claimant is disabled.  The Commissioner of the Social Security Administration reviews a disability claim by evaluating the following:

> (1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.
>
> (2)   Is the claimant's alleged impairment sufficiently severe to limit his ability to work?  If not, the claimant is not disabled.  If so, proceed to step three.
>
> (3)   Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is disabled.  If not, proceed to step four.
>
> (4)   Does the claimant possess the residual functional capacity to perform his past relevant work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> (5)   Does the claimant's residual functional capacity, when considered with the claimant's age, education, and work experience, allow him to adjust to other work that exists in significant numbers in the national economy?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Stout v. Comm'r Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th

Cir. 2006) (citing 20 C.F.R. §§ 404.1520; 416.920).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54 (9th Cir. 2001).

## II.  The Administrative Law Judge Reviewed Plaintiff's Application By Using The Five-Step Sequential Evaluation

Following Plaintiff's January 12, 2023 administrative hearing, the Administrative Law Judge ("ALJ") for the Social Security Administration reviewed Plaintiff's claim by engaging in the five-step sequential evaluation.

The Parties agree there were no errors in the first three steps of the administrative review process.

**<u>At step one</u>**, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 11, 2020, the application date.

Plaintiff's work history was mostly limited to working for Old Navy folding clothes in 2017 through 2019 where she made less than $18,000 in the two years.

**<u>At step two</u>**, the ALJ found that Plaintiff has the following severe impairments: post-traumatic stress disorder, panic disorder with agoraphobia, and major depressive disorder.

**<u>At step three</u>**, the ALJ found that Plaintiff's impairments or combination of impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appx. 1.

**<u>At step four</u>**, the ALJ reviewed the record and made a finding

14

as to Plaintiff's residual functional capacity.

The ALJ found Plaintiff could perform work as follows:

The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand, remember, and carry out simple instructions and make simple work-related decisions; can sustain an ordinary routine without special supervision, and can tolerate occasional changes in work setting; can work at a consistent pace throughout the workday, but not at a production rate pace where each task must be completed within a strict time deadline; can tolerate occasional interaction with coworkers and supervisors and no interaction with the public; and can tolerate a low level of work pressure defined as work not requiring multitasking, detailed job tasks, or significant independent judgment.

(AR at p. 22, ECF No. 17).

**At step five**, the ALJ determined that Plaintiff was unable to perform any past relevant work and inquired with the vocational expert to evaluate if there were other jobs that Plaintiff could perform.

Plaintiff's application for Supplemental Security Income was denied.  The ALJ found that Plaintiff could perform work as a Change House Attendant, Collator Operator, or a Router.  (Id. at p. 30).

## III. Remand Is Required To Enable The ALJ To Properly Consider The Medical Opinions In The Record And The Testimony Of The Vocational Expert

### A.   The ALJ Did Not Properly Evaluate The Medical Opinions In The Record

Pursuant to revised regulations promulgated by the Social Security Administration in January 2017, a medical professional's

relationship with a claimant is no longer a decisive factor when considering the persuasiveness of medical opinion.  The 2017 regulations apply to Plaintiff's case because her claim was filed after March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404 & 416); Woods v. Kijakazi, 32 F.4th 785, 789 (9th Cir. 2022).

The 2017 regulations put forward by the Social Security Administration displaced the Ninth Circuit's longstanding approach.  The new regulations bar fact-finders from giving specific evidentiary weight to particular medical opinions.  See Cross v. O'Malley, 89 F.4th 1211, 1214 (9th Cir. 2024) (quoting 20 C.F.R. § 416.920c(a)).  The practical effect of the regulations was to eliminate the deference that had previously been shown to the medical opinion of a claimant's treating physician.  Woods, 32 F.4th at 792.

Under current Ninth Circuit case law, the ALJ must scrutinize each proffered medical opinion and determine how much weight each opinion affords.  Cross, 89 F.4th at 1213-14; 20 C.F.R. § 416.920c(b).  When evaluating a medical opinion, the ALJ must consider and explain both the evidence's consistency and its supportability.  Id. at 1216; 20 C.F.R. § 416.920c(a)-(c).

Consistency is the extent to which a medical opinion is coherent with the record evidence from other medical and nonmedical sources.  Woods, 32 F.4th at 792-93.  Supportability speaks to the extent to which a medical source supports the

16

medical opinion with relevant medical evidence.  <u>Id.</u>

The ALJ cannot reject a doctor's opinion as inconsistent or unsupported without a sufficient basis.  <u>Woods</u>, 32 F.4th at 792; <u>Paul H. v. Kijakazi</u>, 2023 WL 5420232, *4 (N.D. Cal. Aug. 22, 2023).  The ALJ must articulate how persuasive it finds all of the medical opinions and explain how he considered the consistency and supportability in reaching these findings.  <u>Id.</u>

### 1.    The ALJ Did Not Properly Evaluate The Consistency Of The Opinions Of Dr. Aurellano, Dr. Higashino, and Dr. Ogawa

An ALJ cannot reject a medical opinion for being inconsistent without providing an explanation supported by substantial evidence.  <u>Woods</u>, 32 F.4th at 792.  The consistency factor looks outward and requires the ALJ to consider whether a medical opinion is consistent with the record as a whole, including evidence from other medical sources and nonmedical sources.  <u>See</u> 20 C.F.R. § 416.920c(c)(2).

Three separate Doctors of Psychology from the Hawaii Department of Health and Human Services, (1) Nicole Aurellano, Psy.D.; (2) Dale T. Higashino, Psy.D.; and (3) Erin Ogawa, Psy.D., conducted psychological examinations of Plaintiff from 2019 through 2021.  (AR at pp. 309-12, 314-17, 420-23, 425-28, 431-34, 436-39, ECF No. 8).

The ALJ rejected Dr. Aurellano, Dr. Higashino, and Dr. Ogawa's opinions.  The ALJ did not properly evaluate the opinions and did not sufficiently explain his reasoning for rejecting

their opinions.

The ALJ's decision is difficult to decipher and does not
provide a sufficient basis to ignore these medical evaluations in
the record.  The ALJ did not explain how the three psychologists'
findings were inconsistent with other objective medical evidence
present elsewhere in the record.  <u>Howard v. Kijakazi</u>, Civ. No.
23-00138 JMS-RT, 2023 WL 6141372, *7 (D. Haw. Sept. 20, 2023).

> **a.  The Opinions Of Dr. Aurellano, Dr. Higashino,
> and Dr. Ogawa Are Consistent With Each Other**

It is notable that the three medical opinions all generally
agree with each other as to Plaintiff's diagnoses and
limitations.  The ALJ does not recognize the three opinions'
consistency with each other.

Each psychologist found Plaintiff had a history of trauma
including physical, verbal, and sexual abuse in childhood and
suffered from domestic violence and physical assault as an adult.
(AR at pp. 309-12, 314-17, 420-23, 425-28, 431-34, 436-39, ECF
No. 8).

Each medical professional determined that Plaintiff suffered
from various affective and anxiety disorders including major
depressive disorder and post-traumatic stress disorder that
interfered with Plaintiff's ability to leave her house, interact
with others, and caused her difficulty concentrating, thinking,
and completing tasks.  (<u>Id.</u>)

The three psychologists each determined that Plaintiff

18

suffered from severe panic attacks, easy distractability, and that Plaintiff had difficulty being around others, especially crowded places, and struggled to interact.  (Id. at p. 426, 433, 437-38).

The findings of the three psychologists were supported by ample evidence in the record from other medical professionals that Plaintiff suffered from post-traumatic stress disorder, agoraphobia, anxiety, and a major depressive disorder.  (AR at pp. 318-514).

The ALJ did not properly review this evidence in conducting his consistency analysis.

> **b.   The ALJ's Rejection Of Plaintiff's Mental Health Diagnoses Based On Observations Of Her Physical Attributes Is Misplaced**

The ALJ attempted to disregard the medical evidence in the record by finding that Plaintiff's records indicated that she was well groomed, appropriately dressed, and coherent during her medical appointments.  The ALJ determined that the medical conclusions by the medical professionals about Plaintiff's mental health diagnoses of post-traumatic stress disorder, depression, and agoraphobia were inconsistent with her appearance and behavior at appointments, stating:

> [C]laimant was cooperative, alert and oriented times four, normal speech rate and volume, candid, open manner, good rapport with the therapist, logical, goal-oriented thought process, thought content appropriate to setting, no suicidal or homicidal thoughts, plans, or intent, appropriately dressed, adequately groomed, comfortable level of eye contact, good mood, normal

range affect, normal fine and gross motor movements, oriented to person, place, time, and situation; fund of knowledge in the above average range; no evident memory problem, good attention, intact cognitive function, cooperative, no delusions, hallucinations, or loose associations, speech clear and understandable, future and goal oriented, and no suicidal or homicidal ideation.

(AR at p. 28, ECF No. 8).

The ALJ's analysis does not properly evaluate the detailed and well-reasoned opinions of Dr. Aurellano, Dr. Higashino, and Dr. Ogawa.  Rather, the ALJ's decision attempts to cherry-pick evidence to disregard the opinions altogether.  It is well-established that an ALJ may not cherry-pick evidence in evaluating a medical opinion.  Buethe v. Comm'r of Soc. Sec., 2021 WL 1966202, *4-*5 (E.D. Cal. May 17, 2021) (collecting cases); Cruz v. Kijakazi, 2023 WL 1447855, *5 (E.D. Cal. Feb. 1, 2023) (explaining that "Even under the new regulations, the ALJ may not 'cherry-pick' evidence in discounting a medical opinion").

The ALJ cherry-picked through the medical records and ignored the diagnoses, the objective medical evidence, and the consistency of the opinions based on the record as a whole.  An ALJ may not simply list other medical findings that he chooses to rely upon in the record in conducting a consistency analysis, but he must explain how these findings are inconsistent with other findings in the record.  See Nicole N.-M. v. Comm'r of Soc. Sec. Admin., 649 F.Supp.3d 1025, 1039 (D. Or. 2022) (explaining that the ALJ's reliance on the claimant's demeanor and normal

20

cognition at appointments was not inconsistent with the doctor's findings as to the claimant's limitations).

Here, the ALJ failed to explain how Plaintiff's demeanor and grooming contradicted the three opinions which each found that Plaintiff experienced severe panic attacks and struggled to interact with others because of her history of abuse and trauma. Reynoldson v. Comm'r of Soc. Sec., 649 F.Supp.3d 1114, 1123 (W.D. Wash. 2023) (rejecting the ALJ's reliance on the doctor's observations of a plaintiff in a clinical setting, explaining that the observations did not contradict the medical conclusions as to the claimant's limitations).

Remand is necessary to allow the ALJ to properly evaluate the opinions of Dr. Aurellano, Dr. Higashino, and Dr. Ogawa and the consistency of the three opinions with each other and their consistency with other evidence in the record.  Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015).

**2.    The ALJ Failed To Conduct A Supportability Analysis Of The Opinions Of Dr. Aurellano, Dr. Highasino, and Dr. Ogawa**

The federal regulations and caselaw from the Ninth Circuit Court of Appeals require the ALJ to conduct an analysis into the supportability of the medical opinion.  Woods, 32 F.4th at 792; 20 C.F.R. § 416.920c(c)(1).

Supportability is a distinct analysis from consistency.  See Woods, 32 F.4th at 793 n.4.  Supportability is based on an analysis of whether the medical professional's opinion is

21

supported by his own findings and the rationale the doctor provided for such an opinion.  Id.

The ALJ did not conduct a supportability analysis.  As explained by Plaintiff in her brief, the ALJ improperly cited to other medical evidence in the record in conducting the supportability analysis rather than evaluate whether the psychologists' findings and evaluations supported their own opinions.  (See Opening Brief at pp. 18-19, ECF No. 10).

The ALJ did not conduct an analysis of the specific evaluations conducted by the three psychologists.  He did not explain why their determinations as to Plaintiff's symptoms and limitations were not supported by their evaluations.  The ALJ did not address the degree to which the three psychologists' opinions were supported by their own examination notes, findings, and testing.  Mascarenas v. Comm'r of Soc. Sec. Admin., 2022 WL 2448279, *5 (D. Ariz. July 6, 2022).  The ALJ failed to conduct a proper supportability analysis and remand is required.  Chung v. O'Malley, 2024 WL 3224039, *6 (D. Haw. June 28, 2024); Sidhu v. O'Malley, 2024 WL 2700785, *8 (E.D. Cal. May 24, 2024).

Recent decisions in the District Court for the District of Hawaii have repeatedly remanded similar cases for the same error.  See Wade v. O'Malley, 2024 WL 3248021, at *5 (D. Haw. Feb. 16, 2024); Tue v. Kijakazi, Civ. No. 23-00056 LEK-WRP, 2023 WL 8543056, at *9 (D. Haw. Dec. 11, 2023); Akiu v. Kijakazi, Civ. No. 23-00020 JAO-RT, 2023 WL 6311447, at *9 (D. Haw. Sept. 28, 2023); Howard, Civ. No. 23-00138 JMS-RT, 2023 WL 6141372, at *7.

**B.    The Opinion Of The Vocational Expert In The Record Is Confusing And Unclear**

At step five of the five-step sequential process, the ALJ must determine if the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience.  20 C.F.R. § 416.920(g)(1).  In making this determination, the ALJ relies on the Dictionary of Occupational Titles as well as testimony of vocational experts who testify about specific occupations that a claimant can perform based on her residual functional capacity.  <u>Zavalin v. Colvin</u>, 778 F.3d 842, 845-46 (9th Cir. 2015).

The ALJ may not rely on a vocational expert's testimony that is self-contradictory or where the record is not clear as to the vocational expert's opinion.  <u>Diane B. v. Kijakazi</u>, 2022 WL 94915, *16 (N.D. Cal. Jan. 10, 2022).

Here, rather than question the Vocational Expert during the hearing, the ALJ sent the Vocational Expert interrogatories along with interrogatories prepared by Plaintiff's counsel.  (AR at pp. 282-292, ECF No. 8).

In questions 7 and 10, the ALJ asked:

7.    Assume a hypothetical individual who was born on January 18, 1968, has at least a high school education...[work experience as a sales clerk]. Assume further that this individual has the residual functional capacity (RFC) to perform a full range of work at all exertional levels but with the following nonexertional limitations:

•    Can understand, remember, and carry out simple instructions and make simple work-related

decisions;

• Can sustain an ordinary routine without special supervision, and can tolerate occasional changes in work setting;

• Can work at a consistent pace throughout the workday, but not at a production rate pace where each task must be completed within a strict time deadline;

• Can tolerate occasional interaction with coworkers and supervisors and no interaction with the public; and

• Can tolerate a low level of work pressure defined as work not requiring multitasking, detailed job tasks, or significant independent judgment....

10. Could the individual described in item #7 perform any unskilled occupations with jobs that exist in the national economy?

(AR at p. 283, ECF No. 8).

In response to question 10, the Vocational Expert responded "Yes." (Id. at 284). The ALJ wrote that the jobs of Change House Attendant, Collator Operator, and Router could be performed. (Id.)

The ALJ adopted the Vocational Expert's testimony in response to questions 7 and 10 and found Plaintiff was not disabled and there was work she could perform.

Plaintiff asserts that the ALJ erred in relying on the Vocational Expert's response to questions 7 and 10 because the Vocational Expert provided contradictory testimony in response to a question from Plaintiff's attorney.

Plaintiff's attorney submitted an interrogatory asking if there were jobs a claimant could perform if she was "only able to

24

be around coworkers and supervisors when she feels able, for 80% of the workday; and coworkers and supervisors will have to stay away from her, because she cannot tolerate interaction." (AR at p. 290, ECF No. 8).

In response to the question, the Vocational Expert stated "No." (Id. at pp. 290-91).

Plaintiff asserts that this answer from the Vocational Expert contradicts the Vocational Expert's response to the ALJ's questions 7 and 10 where the Vocational Expert found there were jobs for someone who had only "occasional" interactions with co-workers. (Pl.'s Brief at pp. 9-10, ECF No. 10). Plaintiff relies on the definition of "occasional" as being no more than 2 hours of an 8-hour work-day. (Id.)

Here, the Vocational Expert's responses are confusing and unclear. The answers to the interrogatories from the Vocational Expert do not appear to sufficiently address the hypotheticals from the ALJ and from Plaintiff's counsel. The Court is unclear as to the Vocational Expert's position about the limits between interaction with the public and interaction with co-workers. It appears that the Vocational Expert's responses to the ALJ's questions and the questions of Plaintiff's counsel are in conflict. It is the duty of the ALJ to resolve conflicts and discrepancies in the record. Buck v. Berryhill, 869 F.3d 1040, 1052 (9th Cir. 2017). The ALJ may not ignore apparent conflicts in a vocational expert's testimony. Id.

Remand is appropriate to resolve the unclear and seemingly

contradictory testimony by the Vocational Expert.  Joseph P. v. O'Malley, 2024 WL 1448642, *16 (N.D. Cal. Apr. 2, 2024).

### CONCLUSION

The Commissioner of the Social Security Administration's decision is **REVERSED AND REMANDED** for further proceedings on an open record that is consistent with this Order.

The Clerk of Court shall **CLOSE THE CASE**.

IT IS SO ORDERED.

DATED: July 25, 2024, Honolulu, Hawaii.

Helen Gillmor
United States District Judge

Cindi Asman v. Martin O'Malley, Commissioner of Social Security Administration; Civ. No. 24-00017 HG-RT; **ORDER REVERSING THE DECISION OF THE SOCIAL SECURITY ADMINISTRATION COMMISSIONER AND REMANDING THE CASE FOR FURTHER PROCEEDINGS**